**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| HO WAN KWOK, *et al.* | : | Case No. 22-50073 (JAM) |
| | : | |
| Debtors. | : | |
| | : | |

**INDIVIDUAL DEBTOR'S MOTION FOR LEAVE TO FILE APPEAL OF**
**ORDER GRANTING IN PART MOTION FOR PROTECTIVE ORDER AND, IN THE**
**ALTERNATIVE, PETITION FOR WRIT OF MANDAMUS**

Pursuant to 28 U.S.C. §158(a)(3), Fed. R. Bankr. P. 8004, and 28 U.S.C. § 1651, the individual debtor, Ho Wan Kwok (the "Individual Debtor"), by and through his undersigned counsel, Zeisler & Zeisler, P. C. ("Z&Z"), respectfully moves (the "Motion/Petition") for leave to appeal the Bankruptcy Court's December 9, 2022 Order Granting in Part Motion for Protective Order (Doc. No. 1217, the "Order"), which authorized the production of the Individual Debtor's asylum application (the "Asylum Application") to the chapter 11 trustee Luc A. Despins (the "Trustee") and, in the alternative, petitions for a writ of mandamus vacating the Bankruptcy Court's Order. In further support of his Motion/Petition, the Individual Debtor respectfully states as follows.

## I.     INTRODUCTION

1.      The Individual Debtor has been a political target of the Chinese Communist Party (the "CCP") for many years. In early 2015, after learning that the CCP was going to arrest him on politically motivated charges based on fabricated evidence, the Individual Debtor fled to the United States. Since the Individual Debtor left China, both he and his family have been the subject of relentless threats and harassment by the CCP and its agents.

1

2.      Several years before filing for bankruptcy protection, the Individual Debtor, with

the assistance of counsel at Clark Hill PLC ("Clark Hill"), prepared and submitted the Asylum

Application to the United States Department of Homeland Security. By the Asylum Application,

the Individual Debtor sought refuge in the United States and protection from the CCP's persistent

threats. The Asylum Application contains confidential, highly sensitive information that is

expressly protected from disclosure by 8 C.F.R. §§ 208.6(a) and 1208.6(a).[1]

3.      By the instant motion, the Individual Debtor seeks leave to obtain appellate review

of an order entered by the United States Bankruptcy Court for the District of Connecticut

(*Manning, J.*) (the "Bankruptcy Court"), which authorized the production of, *inter alia*, the

Asylum Application to the Trustee and his counsel. In the alternative, the Individual Debtor

respectfully petitions for a writ of mandamus vacating the Bankruptcy Court's Order.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

4.      On February 15, 2022 (the "Petition Date"), the Individual Debtor filed his

voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the

above-captioned bankruptcy case. On July 7, 2022, the Trustee was appointed. (*See* Doc. No. 514).

5.      One of the assets of the Individual Debtor's bankruptcy estate is a pre-petition claim

(the "Malpractice Action") that the Individual Debtor initiated against Clark Hill. In the

Malpractice Action, the Individual Debtor alleges that he was harmed when Clark Hill's computer

system was hacked, which allowed unauthorized persons to access the Asylum Application.

Specifically, the Individual Debtor asserted, *inter alia*, that as a direct and proximate cause of

Clark Hill's multiple breaches of their duties, the details and contents of the Asylum Application

---

[1] 8 C.F.R. § 208.6(a) and 8 C.F.R. § 1208.6(a) are identical, except one authorizes the Secretary of
Homeland Security and the other authorizes the Attorney General to permit the disclosure of information
contained in or pertaining to an asylum application. For ease of reference, this Motion/Petition cites to only
8 C.F.R. § 1208.6 except where necessary.

were disclosed widely on social media platforms and placed in the hands of third-parties hostile to the Individual Debtor. Clark Hill retained Jenner & Block, LLP ("Jenner & Block") to represent it in the Malpractice Action.

6.      On July 28, 2022, the Trustee filed his Omnibus Motion of Chapter 11 Trustee for Entry of Order under Bankruptcy Rule 2004 and Local Rule 2004-1 Authorizing Discovery with Respect to Various Legal and Financial Advisors to the Debtor (Doc. No. 637, the "Professionals 2004 Motion"), seeking, *inter alia*, to conduct the examination of Clark Hill.

7.      The Individual Debtor filed a limited objection (Doc. No. 703), *inter alia*, to the Professionals 2004 Motion on August 5, 2022, on the grounds that if the proposed order filed therewith was entered and interpreted literally, it would preclude substantive objections to the subpoenas to be served in accordance with the Professionals 2004 Motion, including objections based upon privilege, in violation of Bankr. L. R. 2004-1.

8.      On August 16, 2022, the Bankruptcy Court entered the Order Granting Chapter 11 Trustee's Application for Rule 2004 Discovery with Respect to Various Legal and Financial Advisors to the Debtor (the "Order Granting the Professionals 2004 Motion") (Doc. No. 756).  The Order Granting the Professionals 2004 Motion, *inter alia*, permitted service of a subpoena upon Clark Hill (the "Subpoena"), but directed that compliance was "[s]ubject to any rights under the Federal Rules of Bankruptcy Procedure, the Federal Rules of Civil Procedure, and applicable Local Rules[.]" Thus, the Bankruptcy Court modified the Trustee' proposed order granting the Professionals 2004 Motion so as to preserve the Individual Debtor's and the recipients of the subpoenas' rights to object to the substance of the subpoenas.

9.      On August 18, 2022, the Trustee gave notice that it would serve subpoenas pursuant
to the Order granting the Professionals 2004 Motion, including, *inter alia*, the Subpoena on Clark
Hill.

10.      On September 14, 2022, the Court entered the Consent Order Regarding Control of
Attorney-Client Privilege and Work Product Protection Related to Rule 2004 Subpoenaed
Documents and Information (Doc. No. 856, the "Consent Order"). The Consent Order defined the
scope of the Trustee's and Individual Debtor's respective control of the attorney-client and work-
product privileges and set forth certain procedures for disputes concerning the same. Moreover,
the Consent Order specifically provided:

> Nothing herein shall prevent the Debtor from asserting any and all privileges
> concerning legal matters unrelated to the Investigation Topics, such as unrelated
> criminal allegations or the Debtor's asylum application (other than documents
> related to the litigation styled as *Guo Wengui v. Clark Hill, PLC*, Case No. 19-cv-
> 03195 (D. D.C.) [(the "Clark Hill Action")] that relate to the merits of the legal
> malpractice action, as distinguished from the merits of the Debtor's asylum
> application, subject to the balancing test incorporated herein, **which does not relate
> to the substance of the asylum application**).

(Consent Order, ¶¶ 2, 4.) (emphasis added). The Investigation Activities are limited to the Debtors'
assets, financial condition, or activities related to the administration of the bankruptcy estate,
which, per the Consent Order, "does not relate to the substance of the asylum application." (*Id.*, ¶
2).

11.      During the hearings held in the Bankruptcy Court concerning the negotiation of the
Consent Order, the Trustee and his counsel each represented—and separately so—that the Trustee
did not seek the Debtor's Asylum Application:

> The debtor identifies his concerns about potentially privileged documents related
> to . . . things that have been made against him as well as his asylum application.
> ***We are not, in our investigation at this time, seeking any documents related to
> those issues.*** (Tr. 8/30/22, **Exhibit A**, at 104: 6-11 (Bassett, N.) (emphasis added)).

4

[T]he debtor contends, well as I said before, there's a concern that, you know, it's possible documents the trustee is seeking to have access to could involve potential . . . *unrelated issues like his asylum application, but, again, as I said before, we're not seeking to get those documents through our discovery requests*. (*Id.*, at 110: 12-19 (Bassett, N.) (emphasis added)).

The debtor has identified one request in our subpoena directed to his former law firms and professionals, *Request 17, that asks for information about legal disputes which could be read to include . . . his asylum application, we are willing to make clear on the record that we're not seeking to get that type of information and we'll limit that request accordingly*. (*Id.*, at 110: 20-111:2 (Bassett, N.) (emphasis added)).

[T]*here is no basis that's been provided as to why documents would relate to assets, financial condition, or the administration of the estate, would have anything to do with the debtor's asylum application*. (*Id.*, at 137: 17-20 (Bassett, N.) (emphasis added)).

But, again, if there is language we could work out to make clear if there's a document that talks about . . . *his asylum application*, things like that, in his objection, I think we could work out language to put in the proposed order to again make clear that *we are not seeking that*. (*Id.*, at 138: 24-139: 5 (Bassett, N.) (emphasis added)).

[A]s we've made clear in our order, you know, *there are carveouts designed to address specifically the concerns that the debtor has raised concerning privileged communications that relate to . . . his asylum application*. (Tr. 9/6/22, **Exhibit B**, 49: 5-10 (Bassett, N.) (emphasis added)).

And that is exactly how we tried to craft our revised proposed order is to track those categories in that weigh of the case law and then to also make clear to address the debtor's concerns that he is still able to assert privileges over documents related to . . . his asylum application . . . . (*Id.*, at 76: 13-18 (Bassett, N.)).

So the balancing—[the court is] doing the balancing. [The court is] doing the balancing in a category-by-category document *with some very specific carveouts regarding . . . the asylum issue carved out, [the court is] doing the balancing*. (*Id.*, at 108: 9-15 (Despins, L.) (emphasis added)).

12.    The Bankruptcy Court expressly relied on the Trustee's and his counsel's representations when it entered the Consent Order, just as the Individual Debtor did when he agreed to the Consent Order:

The Bankruptcy Court: Well, I'm trying to figure out how we should proceed. And

right now this was a continued hearing on the trustee's motion to have this court determine that he holds all the privileges of the debtor.

My understanding of that motion was that even though the trustee wants that order, *he would agree to carveout anything with regard to the asylum issue. . .*

*I mean, he was—he's not asserting and never has asserted that he's going to exercise that right.* (*Id.*, at 67: 20-68:5) (emphasis added)).

13.     Thereafter, pursuant to discussions among the Individual Debtor's counsel and Clark Hill's counsel, it was agreed that Clark Hill would produce documents responsive to the Subpoena to the Individual Debtor's counsel for review.

14.     Clark Hill's counsel produced documents to the Individual Debtor's counsel, which included the Asylum Application. Thereafter, counsel for the Individual Debtor asserted to the Trustee's counsel that the Asylum Application is prohibited from disclosure and requested to Clark Hill's counsel that it refrain from producing the Asylum Application to allow the Individual Debtor an opportunity to seek a protective order.

15.     Consequently, the Individual Debtor filed the Motion for Protective Order (ECF No. 1063) with the Bankruptcy Court. The Trustee objected, claiming that his and his counsel's statements to the Bankruptcy Court during hearings concerning the Consent Order were inapplicable because the Trustee did not know at the time that Clark Hill had attached the Asylum Application to its Motion for Summary Judgment in the Malpractice Action.

16.     After hearings held on November 30, 2022, and December 2, 2022, to consider the Individual Debtor's Motion for Protective Order, the Bankruptcy Court issued the Order attached hereto as **Exhibit C**.[2]

---

[2] The Bankruptcy Court's Order references hearings on November 30, 2022 and December 1, 2022. In actuality, the second hearing to consider the Motion for Protective Order was held on December 2, 2022.

17.     In the Order, the Bankruptcy Court held that the Trustee and his counsel "need access to the Motion for Summary Judgment and the Asylum Application to prosecute the Malpractice Action[.]"[3] (Order, at 2). Consequently, the Bankruptcy Court ordered that Jenner & Block (as Clark Hill's counsel) "is authorized to produce the Motion for Summary Judgment and the Asylum Application" to the Trustee and his counsel.[4] (*Id*., at 3).

## III.    THE ASYLUM APPLICATION IS PROTECTED FROM DISCLOSURE BY 8 C.F.R. § 1208.6(a)

18.     As asserted by the Individual Debtor in his Motion for Protective Order submitted to the Bankruptcy Court, the Immigration and Nationality Act ("INA") "prohibits the disclosure of information pertaining to any asylum application. . . ." *Zhong Rong Li v. Gonzales*, 181 F. App'x 124, 128 (2d Cir. 2006); *see also Gafurova v. Whitaker*, 911 F.3d 321, 328 n.3 (6th Cir. 2018) (the INA "generally prohibit[s] the disclosure to third parties of any information relating to an asylum application without the written consent of the applicant unless permitted by the listed exceptions or at the discretion of the [Secretary of the Department of Homeland Security]") (citing 8 C.F.R. §§ 208.6, 1208.6(a)).

19.     Specifically, 8 C.F.R. § 1208.6(a) provides:

> Information contained in or pertaining to any application for refugee admission, asylum, withholding of removal under section 241(b)(3) of the Act, or protection under regulations issued pursuant to the Convention Against Torture's implementing legislation, records pertaining to any credible fear determination conducted pursuant to § 208.30, and records pertaining to any reasonable fear determination conducted pursuant to § 208.31, shall not be disclosed without the written consent of the applicant, except as permitted by

---

[3]   The Individual Debtor does not object to the Trustee receiving Clark Hill's Motion for Summary Judgment and exhibits thereto that do not contain content from his Asylum Application.

[4]   Though the Subpoena was directed at Clark Hill, at oral argument concerning the Individual Debtor's Motion for Protective Order, the Trustee orally requested that Jenner & Block be authorized to produce the Asylum Application. The Individual Debtor objected, asserting that the Trustee's request was procedurally improper. Nonetheless, the Bankruptcy Court authorized Jenner & Block to produce the Asylum Application.

this section or at the discretion of the [Secretary of the Department of Homeland Security].

20.     8 C.F.R. § 1208.6(a), along with the substantially similar 8 C.F.R. § 208.6(a), "establish a 'right' of asylum seekers 'to keep confidential any information contained in or pertaining to an asylum application that allows a third party to link the identity of the applicant to: (1) the fact that the applicant has applied for asylum; (2) specific facts or allegations pertaining to the individual asylum claim contained in an asylum application; or (3) facts or allegations that are sufficient to give rise to a reasonable inference that the applicant has applied for asylum.'" *Al Otro Lado, Inc. v. Nielsen*, No. 17-cv-02366-BAS-KSC, 2017 U.S. Dist. LEXIS 210401, at *22 (S.D. Cal. Dec. 20, 2017) (citation omitted).

21.     "These regulations 'safeguard information that, if disclosed publicly, could subject the claimant to retaliatory measures by government authorities or non-state actors in the event that the claimant is repatriated, or endanger the security of the claimant's family members who may still be residing in the country of origin.'" *Id*., at*22-23, *quoting* U.S. DEP'T OF HOMELAND SECURITY, U.S. Citizenship & Immigration Servs. Asylum Div., *Fact Sheet: Federal Regulations Protecting the Confidentiality of Asylum Applications* (Oct. 12, 2011).

22.     The Trustee argued to the Bankruptcy Court that 8 C.F.R. § 1208.6(a) is inapplicable to the production of an Asylum Application by non-government actors. However, nothing within the text of 8 C.F.R. § 1208.6(a) limits its application in that manner. Rather, ***only certain exceptions*** to the general prohibition against disclosure of an asylum application in 8 C.F.R. § 1208.6(a) apply only to government actors. *E.g.*, 8 C.F.R. § 1208.6(c) ("**This section shall not apply to any disclosure to: (1) Any United States Government official or contractor having a need to examine information in connection with**. . . .") (emphasis added).

23.     Further evidencing the confidentiality of asylum applications, the *Federal Regulation Protecting the Confidentiality of Asylum Applicants Synopsis* (the "Synopsis") prepared by the United States Citizenship and Immigration Services agency, attached hereto as **Exhibit D**, expressly states that third parties who receive an asylum application are bound by the confidentiality regulations. *See Synopsis, Frequently Asked Question 2*, at p. 3 ("In general, asylum-related information must not be shared with third parties without the asylum applicant's written consent or the Secretary of Homeland Security's specific authorization."); *Frequently Asked Question 7*, at p. 4 (Q: If asylum-related information is properly disclosed to a third party pursuant to the regulation, what is the third party's obligation with respect to confidentiality? A: ***As the new custodian of the asylum-related information, the third-party recipient is bound by the confidentiality regulation under 8 CFR 208.6.***") (emphasis added).

24.     Additionally, at least one court in the District of Connecticut has denied a "motion to compel the production of documents concerning [an individual plaintiff's] asylum application" to the defendant in that action on the basis that such material is not generally subject to disclosure, notwithstanding the fact that the defendant argued that the content of the plaintiff's asylum application was relevant to the plaintiff's claim for infliction of emotional distress. *See Bakhit v. Safety Marking, Inc.*, No. 3:13CV1049 (JCH), 2015 U.S. Dist. LEXIS 192934, at *9 (D. Conn. Feb. 17, 2015).

25.     Thus, it is clear that the Asylum Application is protected from disclosure by 8 C.F.R. § 1208.6(a), and that no exception is applicable to permit disclosure.[5] *See* 8 C.F.R. § 1208.6(c)-(e); *see also Bakhit*, No. 3:13CV1049 (JCH), 2015 U.S. Dist. LEXIS 192934, at *9.

---

[5] In addition, the Asylum Application does not relate to the Investigation Activities of the Trustee – *i.e.*, investigation of the Debtor's assets, financial condition, and administration of the estate—a fact that the Trustee's counsel repeatedly represented to the Court during the hearings concerning the Consent Order. Moreover, in light of the fact that the Subpoena had already been served when the Trustee's counsel made

## IV.    THE INDIVIDUAL DEBTOR RESPECTFULLY MOVES FOR LEAVE TO APPEAL THE BANKRUPTCY COURT'S ORDER

### a.  QUESTIONS PRESENTED AND RELIEF SOUGHT

26.    The Individual Debtor respectfully submits the following question in the appeal of the Order:[6]

> i.  Whether the Bankruptcy Court erred in ordering the production of the Asylum Application to the Trustee and his counsel in violation of 8 C.F.R. § 1208.6(a).

27.    The Individual Debtor respectfully requests that the District Court vacate the Order and prohibit the production of the Asylum Application to the Trustee and his counsel.

### b.  REASONS THIS APPEAL SHOULD BE GRANTED

### 1. STATEMENT OF JURISDICTION

28.    This Court has jurisdiction over this proposed appeal pursuant to 28 U.S.C. § 158(a)(3) because the Order sought to be appealed from is an interlocutory ordered entered by the Bankruptcy Court in a core proceeding under 28 U.S.C. § 157 and the Bankruptcy Court has jurisdiction pursuant to 28 U.S.C. § 1334. Venue was proper in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

those representations in open court, the Subpoena cannot reasonably be construed to seek to compel Clark Hill to produce the Individual Debtor's Asylum Application.  Simply stated, since the Trustee represented in open court that the Subpoena did not seek to compel the production of the Asylum Application, and the Court entered an order expressly relying on that representation; *see Exhibit B*, at 67:20-68:5; the Trustee is judicially estopped from arguing that the Subpoena compels (or even permits) Clark Hill to produce the Asylum Application.  *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 620 (2d Cir. 2012) ("[T]he [Supreme] Court has stated that judicial estoppel 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" (*quoting New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).

[6] The Individual Debtor reserves the right to alter, amend, add to, or otherwise change this question when he submits a statement of the issues presented in accordance with the applicable rules.

## 2. STANDARD FOR GRANTING LEAVE TO APPEAL

29.    A party may seek an interlocutory appeal of orders and decrees of the Bankruptcy

Court "with leave of the [District] [C]ourt" pursuant to 28 U.S.C. § 158(a)(3). "[C]ourts in this

Circuit have invariably held that all appeals governed by [28 U.S.C. §] 158(a)(3) should refer to

the standards articulated by [28 U.S.C. §] 1292(b) to determine whether leave to appeal should be

granted." *Golden v. Pa. Higher Educ. Assistance Agency*, No. 22-MC-01899 (HG), 2022 U.S. Dist.

LEXIS 143072, at *11 (E.D.N.Y. Aug. 10, 2022) (quotation, citation, and ellipsis omitted).

30.    This Court may accept an appeal from an interlocutory order if "the order (1)

involves a controlling question of law (2) as to which there is a substantial ground for difference

of opinion, and (3) an immediate appeal from the order may materially advance the ultimate

termination of the litigation." *Osuji v. U.S. Bank, Nat'l Ass'n*, 285 F. Supp. 3d 554, 558 (E.D.N.Y.

2018). "[A]ppellants bear the burden of showing that exceptional circumstances exist that warrant

an interlocutory appeal…." *Id.* (citation and quotation omitted).

### a. THE ORDER INVOLVES A CONTROLLING QUESTION OF LAW

31.    An order involves a controlling question of law where "reversal of the bankruptcy

court's order would (1) terminate the action or (2) materially affect the outcome of the litigation."

*Osuji*, 285 F. Supp. 3d at 558. "In addition, the question of law must refer to a 'pure' question of

law that the reviewing court could decide quickly and cleanly without having to study the record."

*2178 Atl. Realty LLC v. 2178 Atl. Ave. Hous. Dev. Fund Corp.*, No. 20-CV-1278 (RRM), 2021

U.S. Dist. LEXIS 62226, at *11 (E.D.N.Y. Mar. 30, 2021) (citation omitted).

32.    The question of law at the core of the Bankruptcy Court's Order, and this appeal,

is undeniably "pure" and this Court can decide it "quickly and cleanly without having to study the

record." Indeed, the core issue here is whether 8 C.F.R. § 1208.6 prohibits the disclosure of the

Asylum Application to the Trustee. This Court need not review the record to adjudicate this purely legal question.

33.     Additionally, adjudication of this narrow legal question will "materially affect the outcome of the litigation" because this is a contested matter in the Bankruptcy Court and the sole issue is the Trustee's right to access the Asylum Application. *See generally Ritzen Group, Inc. v. Jackson Masonry, LLC*, 140 S.Ct. 582, 586(2020) ("A bankruptcy case embraces an aggregation of individual controversies.") (quotations and citations omitted). With each additional entity that maintains a copy of the Asylum Application, the risk that the Asylum Application falls into the hands of individuals who wish to do the Individual Debtor harm (including the CCP and its agents) rises incrementally, as evidenced by the hack of Clark Hill's computer system. *See generally Dunkin' Donuts Franchising LLC v. CDDC Acquisition Co. LLC (In re FPSDA I, LLC)*, 470 B.R. 257, 265 (E.D.N.Y. 2012) (finding that a question of law "materially affect[s] the outcome of the litigation" when it would force a debtor to act "immediately," as the Individual Debtor might to protect the safety of himself and his family, "which could have significant consequences"). Fundamentally, and despite their presumably best technological and security efforts, the Trustee and his counsel maintaining copies of the Asylum Application increases the potential for unauthorized third parties to obtain copies of the Asylum Application, further infringing on the Individual Debtor's privacy and potential safety.

34.     Therefore, the Bankruptcy Court's Order involves a controlling question of law.

### b. THERE IS A SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION

35.     There is a substantial ground for difference of opinion "where (1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." *Osuji*, 285 F. Supp. 3d 554, 558 (E.D.N.Y. 2018).

36.    The Individual Debtor submits that the law on the protected status of an asylum application under 8 C.F.R. § 1208.6 is well-settled and, as such, there is not conflicting authority on the issue.

37.    However, the issue of whether a chapter 11 bankruptcy trustee has the ability to obtain a copy of a debtor's asylum application—despite well settled law **protecting an asylum application from disclosure**—is a "particularly difficult" issue given a bankruptcy trustee's established duties (including those under 11 U.S.C. § 1106 to investigate the assets and liabilities of the debtor, such as the Malpractice Action) and the highly confidential and protected nature of an asylum application under Federal regulations. *See* 8 C.F.R. § 1208.6. The difficulty of this issue is compounded by the fact that it is, as far as the Individual Debtor can determine, an issue of first impression for the Second Circuit.

38.    Additionally, there is a substantial ground for difference of opinion as to whether the Trustee, in fact, "need[s] access to the… Asylum Application to prosecute the Malpractice Action," which the Bankruptcy Court found without providing any meaningful analysis. (Order, at 2). In opposing the Individual Debtor's Motion for Protective Order, the Trustee stated in highly conclusory fashion that he "needs access to the [Individual] [D]ebtor's [A]sylum [A]pplication" to "fully assess the merits of the Malpractice Action." *Even if* a showing of need was sufficient to overcome the protections provided to the Individual Debtor under 8 C.F.R. § 1208.6 (the Individual Debtor submits that a showing of need is *not* sufficient), the conclusory statements by the Bankruptcy Court and the Trustee as to the Trustee's need to access the Asylum Application provide no basis to understand *why* the Trustee needs the Asylum Application. Accordingly, there is a substantial ground for difference of opinion as regards the Bankruptcy Court Order.[7]

---

[7] See footnote 3.

### c. AN IMMEDIATE APPEAL MATERIALLY ADVANCES THE ULTIMATE TERMINATION OF THE LITIGATION

39.     This prong, "assessing whether an appeal would materially advance termination of the litigation, is satisfied where the appeal promises to advance the time for trial or to shorten the time required for trial." *Osuji*, 285 F. Supp. 3d at 558 (citation and quotation omitted).

40.     The Individual Debtor acknowledges that this appeal technically is a discovery dispute which renders it an interlocutory appeal under binding precedent. However, the ***sole*** issue underlying this dispute is whether Federal regulation entitles the Individual Debtor to keep his Asylum Application confidential from the Trustee and whether the Bankruptcy Court exceeded its authority by ordering Clark Hill's counsel to produce it. Said differently, unlike almost all other discovery disputes, there is no other/larger dispute between the Trustee and the Debtor that will be impacted by the very narrow subject of this appeal, *i.e.,* the Trustee's right (or lack thereof) to access the Debtor's asylum application. In this extreme and highly uncommon circumstance, the Individually Debtor respectfully submits that allowing an immediate appeal will resolve the entirety of this dispute and provide clarity to other courts concerning the rights to which victims of political persecution are entitled.

41.     Therefore, by granting the immediate appeal of the Bankruptcy Court's Order (and subsequently vacating the Order), this Court will resolve the entirety of this underlying dispute between the Individual Debtor and the Trustee and provide necessary guidance to similarly situated parties.

### d. EXCEPTIONAL CIRCUMSTANCES EXIST THAT WARRANT AN INTERLOCUTORY APPEAL

42.     The Individual Debtor respectfully submits that the production of the Asylum Application to the Trustee represents exceptional circumstances warranting an interlocutory appeal for the following reasons.

43.     In issuing the Order, the Bankruptcy Court deviated from the protections afforded to the Individual Debtor under 8 C.F.R. §§ 208.6 and 1208.6. Functionally, with an order than runs barely more than two pages, the Individual Debtor's privacy rights in the Asylum Application enshrined by Congress in the INA were effectively eliminated.

44.     The chilling effects of such an order are profound, as persons may be dissuaded by seeking much-needed bankruptcy protection to avoid producing "information that, if disclosed publicly, could subject the claimant to retaliatory measures by government authorities or non-state actors in the event that the claimant is repatriated, or endanger the security of the claimant's family members who may still be residing in the country of origin." *Al Otro Lado, Inc.*, No. 17-cv-02366-BAS-KSC, 2017 U.S. Dist. LEXIS 210401, at *22-23, *quoting* U.S. DEP'T OF HOMELAND SECURITY, U.S. Citizenship & Immigration Servs. Asylum Div., *Fact Sheet: Federal Regulations Protecting the Confidentiality of Asylum Applications* (Oct. 12, 2011).

45.     One of the purposes of bankruptcy proceedings is "to relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." *Williams v. United States Fid. & Guar. Co.*, 236 U.S. 549, 554-55, 35 S. Ct. 289, 290 (1915). It is simply unjust to force the Individual Debtor to choose between obtaining such relief and protecting himself and his family from retaliatory measures by government authorities or non-state actors. An immediate appeal should be granted in light of this exceptional circumstance.

46.     Unlike in *Mohawk Indus. v. Carpenter*, 558 U.S. 100, 130 S. Ct. 599, 606 (2009), where the Supreme Court held that the improper disclosure of privileged material could be remedied "by vacating [the] adverse judgment and remanding for a new trial," there is no way to avoid the immediately present danger of the Asylum Application falling into the hands of persons and entities who wish the Individual Debtor harm without an immediate appeal. *Id.*, at 109. Simply stated, the issue here is not a potential adverse impact that disclosure may have on litigation (which a court could rectify later)—it is an adverse impact that disclosure may have on the Debtor's safety and security (which, unfortunately, no court can rectify or reverse).

47.     For these reasons, the Individual Debtor respectfully submits that leave to appeal the Bankruptcy Court's interlocutory Order should be granted.

## V.   IN THE ALTERNATIVE, THE INDIVIDUAL DEBTOR RESPECTFULLY PETITIONS FOR WRIT OF MANDAMUS TO VACATE THE BANKRUPTCY COURT'S ORDER

48.     In the Second Circuit, appellate courts "will exercise mandamus review of discovery orders relating to claims of privilege where: (i) an issue of importance and of first impression is raised; (ii) the privilege will be lost in the particular case if review must await a final judgment; and (iii) immediate resolution will avoid the development of discovery practices or doctrine undermining the privilege." *Chase Manhattan Bank, N.A. v. Turner & Newall, PLC*, 964 F.2d 159, 163 (2d Cir. 1992).

49.     The Supreme Court "has recognized that the writ of mandamus has traditionally been used in the federal courts only to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so.… Only exceptional circumstances, amounting to a judicial usurpation of power, will justify the invocation of this

extraordinary remedy. *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35, 101 S. Ct. 188, 190 (1980) (citations and quotations omitted).

50.     In *Chase Manhattan Bank, N.A.*, the Second Circuit entertained a petition for a writ of mandamus "because of the unusual nature of the challenged discovery order," which effectively permitted opposing counsel to conduct a privilege review, "and the significant and important issues it raises relating to the attorney-client privilege." *Id.*, at 166; *see also, e.g., In re Itron, Inc.*, 883 F.3d 553, 568 (5th Cir. 2018) (granting mandamus following improper application of attorney-client privilege); *In re Seagate Tech., LLC*, 497 F.3d 1360, 1375–76 (Fed. Cir. 2007) (granting mandamus after district court held that a party waived the attorney-client privilege and work product), *overruled on other grounds by Halo Elecs., Inc. v. Pulse Elecs., Inc.,* 579 U.S. 93, 136 S. Ct. 1923 (2016).

51.     Here, the production of the Asylum Application is "an issue of great importance" as it eliminates protections explicitly afforded to the Individual Debtor (and all other similarly situated debtors) under 8 C.F.R. §§ 208.6 and 1208.6. *Chase Manhattan Bank, N.A.*, 964 F. 2d, at 163. Likewise, as discussed herein, it appears to be an issue of first impression in this Circuit.

52.     Further, the protections of 8 C.F.R. §§ 208.6 and 1208.6 "will be lost in the particular case if review must await a final judgment." *See Chase Manhattan Bank, N.A.*, 964 F. 2d, at 163. Indeed, the very purpose of 8 C.F.R. §§ 208.6 and 1208.6 is to prevent the disclosure "to third parties of any information relating to an asylum application without the written consent of the applicant unless permitted by the listed exceptions," which do not apply to the current situation,

"or at the discretion of the Attorney General" or the Secretary of Homeland Security, which have not authorized the disclosure. *Gafurova v. Whitaker*, 911 F.3d 321, 328 n.3 (6th Cir. 2018) (citing

8 C.F.R. §§ 208.6, 1208.6(a)). If the Trustee and his counsel obtain a copy of the Asylum
Application pursuant to the Order, then the Individual Debtor's privacy rights under 8 C.F.R. §§
208.6 and 1208.6 immediately vanish.

53.    Finally, the "immediate resolution" of the dispute regarding the Asylum
Application "will avoid the development of discovery practices or doctrine undermining the
privilege," specifically a doctrine that allows a bankruptcy trustee (and a bankruptcy court) to
circumvent the provisions of 8 C.F.R. §§ 208.6 and 1208.6, which are designed solely to protect
asylum applicants – the very narrow class of persons to which the Individual Debtor is indisputably
a party. *Chase Manhattan Bank, N.A.*, 964 F. 2d, at 163.

54.    As in *Chase Manhattan Bank, N.A.*, the Bankruptcy Court's Order is "unusual," to
say the least, in that it permits the Trustee to obtain documents that are confidential and protected
pursuant to Federal regulations and does so without any legal analysis that addresses the regulation.
For this reason, and because of "the significant and important issues" the Order "raises relating to"
the confidentiality of asylum applications, this Court should grant this petition for a writ of
mandamus. *Chase Manhattan Bank, N.A.*, 964 F. 2d, at 166.

**VI.    CONCLUSION**

55.    For the reasons set forth above, this Court should (i) grant the Individual Debtor
leave to appeal the Bankruptcy Court's Order or, in the alternative, (ii) grant the Individual
Debtor's petition for a writ of mandamus.

THE DEBTOR,
HO WAN KWOK

By:     */s/ Aaron A. Romney*
         Aaron A. Romney (ct28144)
         ZEISLER & ZEISLER, P.C.
         10 Middle Street, 15th floor
         Bridgeport, CT  06605
         Telephone: (203) 368-4234
         Facsimile: (203) 368-0903
         Email: aromney@zeislaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13 day of December, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By:    */s/ Aaron A. Romney*
Aaron A. Romney (ct28144)

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION


In Re                              *   Case No. 22-50073 (JAM)
                                   *
        HO WAN KWOK,               *   Bridgeport, Connecticut
                                   *   August 30, 2022
                    Debtor.        *
                                   *
    * * * * * * * * * * * * * * *  *

        TRANSCRIPT OF ORDER SCHEDULING STATUS CONFERENCE;
          MOTION FOR ORDER ESTABLISHING REPAIR RESERVE
           FOR LADY MAY; MOTION TO EXPEDITE HEARING;
            MOTION TO STAY PENDING APPEAL ESTABLISHING
          REPAIR RESERVE FOR THE LADY MAY; MOTION TO STAY
            SECS.523/727 ADVERSARY PROCEEDINGS; MOTION
        FOR ORDER PROVIDING THAT CONTROL OF PRIVILEGES
      PASSED TO TRUSTEE UPON APPOINT AND FOR RELATED RELIEF
            BEFORE THE HONORABLE JULIE A. MANNING
              UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor,               STEPHEN M. KINDSETH. ESQ.
 HK International and          AARON ROMNEY, ESQ.
 Mei Guo:                     ERIC HENZY, ESQ.
                              Zeisler & Zeisler, P.C.
                              10 Middle Street, 15th Floor
                              Bridgeport, CT  06604



For the Creditor, Pacific     LAURA ARONSSON, ESQ.
 Alliance Asia Opportunity    STUART M. SARNOFF, ESQ.
 Fund L.P.:                   O'Melveny & Myers LLP
                              Times Square Tower
                              7 Times Square
                              New York, NY  10036

                              PATRICK BIRNEY, ESQ.
                              Robinson & Cole
                              28 Trumbull Street
                              Hartford, CT  06103


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

```
APPEARANCES:  (Cont'd)

For the Creditors Committee:  IRVE GOLDMAN, ESQ.
                              Pullman & Comley
                              850 Main Street
                              Bridgeport, CT  06601


For the U.S. Trustee:         HOLLEY CLAIBORN, ESQ.
                              Office of the United States
                                 Trustee
                              The Giaimo Federal Building
                              150 Court Street, Room 302
                              New Haven, CT  06510


Chapter 11 Trustee:           LUC A. DESPINS, ESQ.
                              Paul Hastings LLP
                              200 Park Avenue
                              New York, NY  10166


Counsel for the              NICHOLAS BASSETT, ESQ.
 Chapter 11 Trustee:          Paul Hastings LLP
                              200 Park Avenue
                              New York, NY  10166

                              PATRICK R. LINSEY, ESQ.
                              Neubert, Pepe & Monteith, P.C.
                              195 Church Street, 13th Floor
                              New Haven, CT  06510


For Verdolino & Lowey:        WILLIAM BALDIGA, ESQ.
                              Brown Rudnick
                              Seven Times Square
                              New York, NY  10036
```

1    are limiting that.

2          If you look at the request for release section of

3    our motion, which we cited again in our reply, we're looking

4    specifically for assets of the estate, his financial

5    condition and matters relating to administration.

6          The debtor identifies his concerns about

7    potentially privileged documents related to criminal issues

8    such as allegations of rape and false imprisonment and other

9    things that have been made against him as well as his asylum

10   application.  We are not, in our investigation at this time,

11   seeking any documents related to those issues.

12         Again, we're focused on assets and an

13   investigation that hopefully be used to augment this estate.

14         Second, Your Honor, we're not asking for a waiver

15   or any control over privileges that belong to other parties.

16   And, in fact, I don't know how one could even read our

17   motion to be requesting that relief.

18         We are, to be clear, seeking a determination that

19   the trustee has succeeded to any privileges that the debtor

20   holds with other parties in terms of a common interest or a

21   joint defense privilege.  And we cite case law for that in

22   our motion.  And I don't think that's contested, frankly.

23         But what we're not seeking, what the debtor seems

24   to suggest we are seeking, but we're not, is an order from

25   the Court that the trustee now controls any privilege that

1    that very specifically seek documents related to assets of

2    the estate, other transactional matters involving the debtor

3    prior to the bankruptcy, and other things that simply do not

4    implicate the types of concerns regarding criminal

5    liability, et cetera, that this debtor is worried about.

6         So there's nothing in the approach that the *Foster*

7    case was concerned about that we're trying to ask the Court

8    to do here.

9         And frankly, if you look at other cases, there are

10   plenty of other cases that have issued the type of order

11   that we're asking this court to issue, including one of the

12   cases we cite is the *In re Tarkington* case from the Eastern

13   District of North Carolina in 2010.

14        There, there was an investigation into potential

15   estate assets.  The trustee wanted to depose an attorney who

16   represented the debtor prior to the bankruptcy, and what the

17   Court ended up doing was, all right, I'm going to let the

18   deposition go forward, here is what I consider to be within

19   the scope of the privilege.

20        All of the privilege related to assets of the

21   estate, et cetera, has passed to the trustee.  Anything that

22   could go under criminal liability or those things could

23   still be covered by a privilege.

24        So you can go take the deposition, and counsel to

25   the debtor can interpose objections consistent with that,

1    These are cases where the issue was the trustee

2    was trying to investigate assets of the estate that would

3    potentially relate in, you know, augmenting the estate, of

4    the value of those assets.

5    And what the courts held in those cases is that

6    this is a situation where the debtor would benefit from

7    that.

8    These are -- when the debtor's estate is augmented

9    by additional -- the location of causes of action or the

10   identification of other assets he benefits.  He's not harmed

11   by that.

12   So, you know, the debtor contends, well, as I said

13   before, there's a concern that, you know, it's possible

14   documents that the trustee is seeking to have access to

15   could involve potential criminal liability, whether it's the

16   rape allegations that he mentioned, false imprisonment, or

17   completely unrelated issues like his asylum application,

18   but, again, as I said before, we're not seeking to get those

19   documents through our discovery requests.

20   The debtor has identified one request in our

21   subpoena directed to the debtor's former law firms and

22   professionals, Request 17, that asks for information about

23   legal disputes which could be read to include criminal

24   actions against him, to the extent there are any, or his

25   asylum application, we're willing to make clear on the

1   record that we're not seeking to get that type of

2   information and we'll limit that request accordingly.

3          I mean, the only plausible scenario where the

4   debtor could say that he has a document that is responsive

5   to our subpoena, but also could result in harm to him, is

6   that there's some document that relates to his assets,

7   relates to the topics that we're seeking to explore, and

8   also somehow implicates his criminal liability.

9          But the debtor has not even offered one hint of

10  what that could be.  He's come forward with nothing to

11  suggest other than, as he said in his opposition,

12  allegations of false imprisonment and the like.

13         There is no reason to believe that he's given of

14  that we have that I could even imagine as to why the

15  documents we're seeking related to, for example, his

16  interest in the New York condominium, the Lady May, to all

17  the other private jets and things like that that he's talked

18  about, there's no conceivable scenario where those documents

19  would relate to these types of issues.

20         So this idea that the balancing test would weigh

21  in favor of not passing control over of these privileges to

22  the estate is just -- I think there's no weight to that.

23         The debtor also raises, Your Honor, the non-

24  dischargeability actions that have been filed against him.

25  And he says that while there's a concern there I could be

1    all.  So there's just no legitimate concern at all that

2    somehow we're going to get information related to these

3    actions.

4            And by the way, we're not going to share the

5    documents we get with the plaintiffs to those actions, so

6    this idea of a concern on the 523 actions, again, I think is

7    just -- it's really nonexistent.

8            A couple -- a couple more points, Your Honor,

9    before I wrap up.  At least on my opening remarks.

10           The debtor in his objection, although he initially

11   says the Court shouldn't issue any ruling here, he says,

12   well, if the Court does, it could issue certain guidance.

13           And the way I think the debtor frames that

14   guidance is to say that the Court could direct the

15   recipients -- and this is in paragraph 33 of the objection -

16   - the Court could direct the recipients of the subpoenas to

17   withhold documents on the basis of privilege, quote, "Only

18   documents that they believe potentially implicate harm to

19   the debtor such as criminal allegations, facts relating to

20   non-dischargeability, or facts that have nothing to do with

21   the debtor's estate, such as his pending asylum application.

22           Now, some of that actually sounds consistent with

23   the remarks I've given today, but I think it also highlights

24   sort of what we're also worried about and the mischief that

25   could result if an order specific to that language is

Ho Wan Kwok - August 30, 2022                                    137

1    questions.  Thank you.

2                MR. ROMNEY:  Thank you, Your Honor.

3                MR. BASSETT:  Your Honor, just briefly in

4    response.  I think I might stay here this time if that's

5    okay.

6                THE COURT:  That's fine.

7                MR. BASSETT:  So Mr. Romney, in addressing our

8    proposed changes to the language, I think his position was

9    that, well, we're still not providing for the application of

10   a balancing test because if what we're saying is that

11   privileges related to the debtor's assets, financial

12   condition, or the administration of his estate, pass to the

13   trustee, it doesn't account for the possibility that there's

14   some other personal, individual interest, criminality or

15   otherwise that the debtor might have.

16               And I think the fallacy in that logic is that

17   there is no basis that's been provided as to why documents

18   would relate to assets, financial condition, or the

19   administration of the estate, would have anything to do with

20   the debtor's asylum application, with criminal allegations

21   that are made against -- that have been made against him for

22   rape or false imprisonment.

23               I mean, if the debtor's concern is that there

24   could be hypothetically a document where the debtor was

25   having a conversation with his counsel about both false

Fiore Reporting and Transcription Service, Inc.

Ho Wan Kwok - August 30, 2022                              139

1   unrelated criminal liability or, you know, the particular

2   things, again, that he's mentioned, his asylum application,

3   things like that, in his objection, I think we could work

4   out language to put in the proposed order to again make

5   clear that we're not seeking that.

6          I think there are other tweaks we would need,

7   including to reserve our right to the extent of any withheld

8   documents that we think might be relevant to the trustee's

9   investigation on a crime-fraud exception to the attorney-

10  client privilege, for example, but I do think there is a way

11  to work out some language that could address some of the

12  debtor's concerns.

13         But, again, it cannot be a situation where the

14  debtor gets to decide when he's harmed by the disclosure of

15  a document because that is an open invitation for him to

16  just withhold documents that he doesn't want us to see.

17         Thank you, Your Honor.

18         THE COURT:  Thank you.

19         MR. ROMNEY:  Your Honor, if I may?

20         THE COURT:  Yes.

21         MR. ROMNEY:  Very, very briefly.

22         I've already said creating a privilege log is not

23  deciding.

24         But I do want to make one perhaps significant

25  clarification, which is, these order -- the proposed order

Fiore Reporting and Transcription Service, Inc.

1          MR. BASSETT:  Thank you, Your Honor.

2          THE COURT:  Is there anything else that we can

3     address today in the case?

4          (No response)

5          THE COURT:  Okay.  This was the last matter on

6     today's calendar, so we will see you next Tuesday at 1:00

7     p.m., and court is adjourned.

8          (Proceedings concluded at 4:29 p.m.)

9          I, CHRISTINE FIORE, court-approved transcriber and

10    certified electronic reporter and transcriber, certify that

11    the foregoing is a correct transcript from the official

12    electronic sound recording of the proceedings in the above-

13    entitled matter.

14

15    *Christine Fiore*

16    _____          September 10, 2022

17       Christine Fiore, CERT

18       Transcriber

19

20

21

22

23

24

25

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

```
In Re                          *   Case No. 22-50073 (JAM)
                               *
     HO WAN KWOK,              *   Bridgeport, Connecticut
                               *   September 6, 2022
                    Debtor.    *
                               *
*  *  *  *  *  *  *  *  *  *  *  *  *  *
```

TRANSCRIPT OF MOTION FOR ORDER PROVIDING
THAT CONTROL OF PRIVILEGES PASSED TO
TRUSTEE UPON APPOINTMENT AND FOR
RELATED RELIEF
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

```
For the Debtor,              ERIC HENZY, ESQ.
 HK International and        AARON ROMNEY, ESQ.
 Mei Guo:                    Zeisler & Zeisler, P.C.
                             10 Middle Street, 15th Floor
                             Bridgeport, CT  06604


For the Creditor, Pacific    PETER FRIEDMAN, ESQ.
 Alliance Asia Opportunity   O'Melveny & Myers LLP
 Fund L.P.:                  Times Square Tower
                             7 Times Square
                             New York, NY  10036

                             ANNECCA SMITH, ESQ.
                             Robinson & Cole
                             28 Trumbull Street
                             Hartford, CT  06103
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

APPEARANCES:    (Cont'd)

For the Creditors Committee:  IRVE GOLDMAN, ESQ.
                              Pullman & Comley
                              850 Main Street
                              Bridgeport, CT  06601

For the U.S. Trustee:         HOLLEY CLAIBORN, ESQ.
                              Office of the United States
                                Trustee
                              The Giaimo Federal Building
                              150 Court Street, Room 302
                              New Haven, CT  06510

For the Chapter 11            NICHOLAS BASSETT, ESQ.
 Trustee:                     Paul Hastings LLP
                              200 Park Avenue
                              New York, NY  10166

                              PATRICK R. LINSEY, ESQ.
                              Neubert, Pepe & Monteith, P.C.
                              195 Church Street, 13th Floor
                              New Haven, CT  06510

Chapter 11 Trustee:           LUC A. DESPINS, ESQ.
                              Paul Hastings LLP
                              200 Park Avenue
                              New York, NY  10166

1     this order because this order is designed to prevent the

2     debtor from doing that.

3            Another bucket I think that could exist that could

4     generate future disputes as to privileged communications is

5     that, as we've made clear in our order, you know, there are

6     carve outs designed to address specifically the concerns

7     that the debtor has raised concerning privileged

8     communications that relate to criminal allegations that have

9     been made against him or that relate to his asylum

10    application.  And I'm happy to and I'm prepared to walk

11    through our changes in more detail.

12           But, again, if the debtor were to assert a

13    privilege over those documents on a privilege log, then we

14    could be back before the Court disputing those privileges

15    because the point of the order is to reserve all rights with

16    respect to those privileges.

17           It could be that the debtor asserts a privilege

18    over criminal allegations. Then, you know, we would argue

19    that there's a crime fraud exception and we would otherwise

20    argue that the document is just not privileged.  So that

21    could be back before the Court.

22           But to answer the Court's question, if this order

23    is entered, it does resolve what we are asking the Court to

24    do today.

25           And, again, Your Honor, what we filed was a copy

1    out anything with regard to the asylum issue, anything with

2    regard to these alleged tort issues and, obviously, with

3    regard to the Fifth Amendment.

4         I mean, he was -- he's not asserting and never has

5    asserted that he's going to exercise that right.

6         MR. ROMNEY:  Yeah.  Well, there is a discrepancy,

7    as I read the orders on the -- what I would describe as tort

8    issue.

9         THE COURT:  Well, I -- I mean --

10        MR. ROMNEY:  Yeah.

11        THE COURT:  -- I'm talking about the allegations

12   of rape and things like that.  I don't know what those are

13   about, but that's what's been put forth, right, in this --

14   in the record of this case.

15        Before the trustee was even appointed there were

16   people that said that they -- these causes of action were

17   out there.  Those creditors filed motions in this case.

18   They said a lot of things, obviously, none of which have

19   been substantiated in this court at this point and maybe

20   never will be.  Okay?

21        So that's what I'm talking about when I'm talking

22   -- I'm talking about some of the alleged very difficult to

23   discuss torts, not, you know, if there was some other --

24   like maybe you claimed the -- I don't even know.

25        As you know, I didn't read the UBS complaint.  Is

1    Second Circuit authority on this question -- but I do think,

2    as we tried to marshal in our papers and talk about at last

3    week's hearing, there are many bankruptcy cases out there

4    that have tried to address the issue of the individual

5    privileges passing to a trustee in the wake of *Weintraub*.

6         And I think the overwhelming majority of those

7    cases and the clear trend of the case law is to say that the

8    trustee passes when the privilege relates to efforts by the

9    trustee to identify estate assets, to investigate the

10   debtor's financial condition, and certainly with respect to

11   any post-petition matters affecting the administration of

12   his estate prior to the appointment of a trustee.

13        And that is exactly how we tried to craft our

14   revised proposed order is to track those categories in that

15   weight of the case law and then to also make clear to

16   address the debtor's concerns that he is still able to

17   assert privileges over documents related to criminal

18   allegations or to his asylum application but are not related

19   to those four -- to those three categories that I just

20   mentioned.

21        So to address the particular comment that Attorney

22   Romney made, I think he said, you know, there may be a

23   document that talks about estate assets, but it also, you

24   know, is a privileged communication related to criminal

25   allegations against the debtor, you know, that have been

1    communications with Brown Rudnick when he was a debtor-in-

2    possession, there's no debate in the case law that we have

3    access to that.  It's narrow.  It's a demonstration of the

4    case.  And he was acting as a fiduciary, not in his own

5    capacity.  And he was getting -- you know, shame on Brown

6    Rudnick if they were giving him advice on his personal

7    situation.  They were giving advice to him as a debtor-in-

8    possession.  And that's fundamental, Your Honor.

9            So the balancing -- you're doing the balancing.

10   You're doing it on a category-by-category document with some

11   very specific carve outs regarding the -- what do we call

12   the crime, I want to be precise about this, although it's

13   unfortunate,  but the rape and confinement allegations

14   carved out, the asylum issue carved out, you're doing the

15   balancing.

16           And courts, that's the way they've done it, by

17   categories of documents.  Where courts have been reversed,

18   the only circuit court that reversed, and in that case, it's

19   the same as here, where both sides agreed there should be a

20   balancing test, is that the Court did not look at any

21   documents or any category of documents.

22           And here the Court has right in front of it the

23   very narrow categories that we're raising.  And on that

24   basis you have the power to do this.

25           THE COURT:  Okay.  Anything further from anyone

1    hearing today on the Kwok matter.

2              MR. BASSETT:  Thank you, Your Honor.

3              THE COURT:  Thank you.

4         (Proceedings concluded at 3:31 p.m.)

5              I, CHRISTINE FIORE, Certified Electronic Court

6    Reporter and Transcriber, certify that the foregoing is a

7    correct transcript from the official electronic sound

8    recording of the proceedings in the above-entitled matter.

9

10   *Christine Fiore*

11   _____        September 14, 2022

12       Christine Fiore, CERT

13

14

15

16

17

18

19

20

21

22

23

24

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | Case No. 22-50073 (JAM) |
| HO WAN KWOK, *et al.*,[1] | ) | (Jointly Administered) |
|  | ) |  |
| Debtors. | ) | Re: ECF No. 1063 |
|  | ) |  |

## <u>ORDER GRANTING IN PART MOTION FOR PROTECTIVE ORDER</u>

On November 2, 2022, Ho Wan Kwok (the "Individual Debtor") filed a Motion for

Protective Order, ECF No. 1063, (the "Motion"), seeking to prevent the production of Clark Hill

PLC's motion for summary judgment (the "Motion for Summary Judgment") and the Individual

Debtor's asylum application attached to the Motion for Summary Judgment (the "Asylum

Application") in the case of *Guo Wengui v. Clark Hill PLC*, 1:19-cv-03195-JEB (D.D.C.)

(hereinafter the "Malpractice Action"). On November 16, 2022, Luc A. Despins, in his capacity

as Chapter 11 Trustee (the "Trustee" and, together with the Individual Debtor, the "Parties") for

the estate of the Individual Debtor (the "Estate"), filed an objection to the Motion, ECF No.

1105, (the "Objection"). On November 29, 2022, the Individual Debtor filed a reply in support

of the Motion, ECF No. 1174, (the "Reply").

---

[1] The Debtors in these Chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles
Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification
number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202), and
Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC,
and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY
10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of
notices and communications).

A hearing on the Motion was held on November 30, 2022.  The Court gave the Parties time to attempt to settle the issues raised in the Motion and continued the hearing to December 1, 2022.  During the continued hearing, the Parties reported that they were not able to reach a settlement of the Motion.

The Court finds that, in accordance with the provisions of a consent order regarding attorney client and work-product privileges, ECF No. 856, (the "Privileges Consent Order"), the Motion for Summary Judgment and the Asylum Application are "documents related to the [Malpractice Action] that relate to the merits of the legal malpractice action."  (ECF No. 856 ¶ 4.)  The Court further finds that the Trustee and his counsel need access to the Motion for Summary Judgment and the Asylum Application to prosecute the Malpractice Action, which is an asset of the Estate, and that production of these documents to the Trustee and his counsel will not result in personal harm to the Individual Debtor in accordance with the terms of the Privileges Consent Order.  (ECF No. 856 ¶ 7.)  Therefore, upon review of the relevant pleadings, the arguments of counsel advanced during the hearing, and for the reasons stated on the record, it is hereby

**ORDERED**:  The Motion is GRANTED in part.  The Motion for Summary Judgment and the Asylum Application shall be produced only to the Trustee and his counsel.  As it relates to these bankruptcy cases, only the Individual Debtor and his counsel and the Trustee and his counsel shall have access to the Motion for Summary Judgment and the Asylum Application at this time.  The Motion for Summary Judgment and the Asylum Application are not to be discussed, shown, or produced in any way to other interested parties in these bankruptcy cases; and it is further

**ORDERED**:  Jenner & Block LLP is authorized to produce the Motion for Summary

Judgment and the Asylum Application only to the Trustee and his counsel pursuant to this Order

and in accordance with the protective order in the Malpractice Action, as applicable.


Dated at Bridgeport, Connecticut this 9th day of December, 2022.

*Julie A. Manning*
United States Bankruptcy Judge
District of Connecticut

# EXHIBIT D

Prepared by the USCIS Asylum Division
Date: October 18, 2012

## Fact Sheet: Federal Regulation Protecting the Confidentiality of Asylum Applicants

### Synopsis

The federal regulation at 8 CFR 208.6 generally prohibit the disclosure to third parties of information contained in or pertaining to asylum applications, credible fear determinations, and reasonable fear determinations—including information contained in RAPS or APSS[1]—except under certain limited circumstances. This regulation safeguards information that, if disclosed publicly, could subject the claimant to retaliatory measures by government authorities or non-state actors in the event that the claimant is repatriated, or endanger the security of the claimant's family members who may still be residing in the country of origin. Moreover, public disclosure might, albeit in rare circumstances[2], give rise to a plausible protection claim where one would not otherwise exist by bringing an otherwise ineligible claimant to the attention of the government authority or non-state actor against which the claimant has made allegations of mistreatment.

According to established guidance, confidentiality is breached when information contained in or pertaining to an asylum application (including information contained in RAPS or APSS) is disclosed to a third party in violation of the regulation, and the unauthorized disclosure is of a nature that allows the third party to link the identity of the applicant to: (1) the fact that the applicant has applied for asylum; (2) specific facts or allegations pertaining to the individual asylum claim contained in an asylum application; or (3) facts or allegations that are sufficient to give rise to a reasonable inference that the applicant has applied for asylum. The same principles generally govern the disclosure of information related to credible fear and reasonable fear determinations, as well as to applications for withholding or deferral of removal under Article 3 of the Convention Against Torture, which are included in the asylum application.

In the absence of the asylum applicant's written consent or the Secretary of Homeland Security's[3] specific authorization, disclosure may be made only to United States government officials or contractors and United States federal or state courts on a need to know basis related to certain administrative, law enforcement, and civil actions. In some instances, interagency arrangements have been established to facilitate the proper disclosure of asylum-related information to United States agencies pursuant to the regulation. The release of information relating to an asylum application, credible fear determination, or reasonable fear determination to an official of another government or to any entity for purposes not specifically authorized by the

---

[1] RAPS is the system for maintenance of records concerning aliens who affirmatively seek asylum by applying for the benefit with USCIS. APSS is the system for maintenance of records concerning aliens referred to a USCIS asylum officer for a credible fear or reasonable fear screening determination after having expressed a fear of return to the intended country of removal because of persecution or torture during the expedited removal process under INA sec. 235(b) or administrative removal processes under INA sec. 238(b) or INA sec. 241(a)(5).

[2] Public disclosure alone will rarely be sufficient to establish *sur place* protection claims under U.S. asylum laws. The applicant would have to establish, in light of this disclosure, that he or she has a well-founded fear of persecution on account of one of the protected grounds.

[3] By operation of section 1512(d) of the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, 2310, the Attorney General's authority under 8 C.F.R. § 208.6(a) to authorize disclosure of confidential asylum information held by the former Immigration and Naturalization Service (INS)—and now held by the Department of Homeland Security (DHS)—was transferred to the Secretary of DHS.

1

Prepared by the USCIS Asylum Division
Date: October 18, 2012

regulation without the written consent of the claimant requires the express permission of the Secretary of Homeland Security.

## Code of Federal Regulations, Title 8
Sec. 208.6 *Disclosure to third parties.*

(a) Information contained in or pertaining to any asylum application, records pertaining to any credible fear determination conducted pursuant to § 208.30, and records pertaining to any reasonable fear determination conducted pursuant to § 208.31, shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Attorney General [now the Secretary of DHS].

(b) The confidentiality of other records kept by the [Immigration and Naturalization] Service [now DHS] and the Executive Office for Immigration Review that indicate that a specific alien has applied for asylum, received a credible fear or reasonable fear interview, or received a credible fear or reasonable fear review shall also be protected from disclosure. The Service [now DHS] will coordinate with the Department of State to ensure that the confidentiality of those records is maintained if they are transmitted to Department of State offices in other countries.

(c) This section shall not apply to any disclosure to:

(1) Any United States Government official or contractor having a need to examine information in connection with:

(i) The adjudication of asylum applications;

(ii) The consideration of a request for a credible fear or reasonable fear interview, or a credible fear or reasonable fear review;

(iii) The defense of any legal action arising from the adjudication of, or failure to adjudicate, the asylum application, or from a credible fear determination or reasonable fear determination under § 208.30 or § 208.31;

(iv) The defense of any legal action of which the asylum application, credible fear determination, or reasonable fear determination is a part; or

(v) Any United States Government investigation concerning any criminal or civil matter; or

(2) Any Federal, State, or local court in the United States considering any legal action:

(i) Arising from the adjudication of, or failure to adjudicate, the asylum application, or from a credible fear or reasonable fear determination under § 208.30 or § 208.31; or

(ii) Arising from the proceedings of which the asylum application, credible fear determination, or reasonable fear determination is a part.

## Frequently Asked Questions

**1. Q: Why does the regulation protect asylum-related information from disclosure?**

A: Public disclosure of asylum-related information may subject the claimant to retaliatory measures by government authorities or non-state actors in the event that the claimant is repatriated, or endanger the security of the claimant's family members who may still be residing in the country of origin. Moreover, public disclosure might, albeit in some limited circumstances, give rise to a plausible protection claim where one would not otherwise exist by bringing an otherwise ineligible claimant to the attention of the government authority or non-state actor against which the claimant has made allegations of mistreatment. Because refugee applicants face similar negative consequences when their information is disclosed to

2

Prepared by the USCIS Asylum Division
Date: October 18, 2012

a third party, as a matter of policy, USCIS extends the same protections outlined in 8 CFR
208.6 to refugees.

**2. Q: Under what specific circumstances can asylum-related information be disclosed to
third parties?**

A: In general, asylum-related information must not be shared with third parties without the
asylum applicant's written consent or the Secretary of Homeland Security's specific
authorization. However, this general prohibition does not apply to the following limited
circumstances as established by the regulation at 8 CFR 208.6:
   (1) Any United States Government official or contractor having a need to examine
information in connection with:
   (i) The adjudication of asylum applications;
   (ii) The consideration of a request for a credible fear or reasonable fear interview, or a
credible fear or reasonable fear review;
   (iii) The defense of any legal action arising from the adjudication of, or failure to
adjudicate, the asylum application, or from a credible fear determination or reasonable fear
determination under § 208.30 or § 208.31;
   (iv) The defense of any legal action of which the asylum application, credible fear
determination, or reasonable fear determination is a part; or
   (v) Any United States Government investigation concerning any criminal or civil matter;
or
   (2) Any Federal, State, or local court in the United States considering any legal action:
   (i) Arising from the adjudication of, or failure to adjudicate, the asylum application, or
from a credible fear or reasonable fear determination under § 208.30 or § 208.31; or
   (ii) Arising from the proceedings of which the asylum application, credible fear
determination, or reasonable fear determination is a part."

**3. Q: To what extent may asylum-related information be disclosed to personnel within the
Department of Homeland Security (DHS), such as Immigration and Customs
Enforcement (ICE) or Customs and Border Protection (CBP) personnel?**

A: Asylum-related information may be disclosed to ICE and CBP personnel, as they are not
considered "third parties" for the purposes of 8 CFR 208.6. Protected asylum-related
information may also be disclosed to offices within the direct policy and legal chains of
command of DHS, such as DHS Office of General Counsel, the Office of the Undersecretary
for Border and Transportation Security (BTS), the Office of the Deputy Secretary, and the
Office of the Secretary.

**4. Q: If none of the regulatory exceptions applies, what information about an asylum
applicant, if any, may be shared with third parties without breaching confidentiality?**

A: According to established guidance, confidentiality is breached when information
contained in or pertaining to an asylum application is disclosed to a third party in violation of
the regulation, and the unauthorized disclosure is of a nature that allows the third party to
link the identity of the applicant to: (1) the fact that the applicant has applied for asylum; (2)

3

specific facts or allegations pertaining to the individual asylum claim contained in an asylum
application; or (3) facts or allegations that are sufficient to give rise to a reasonable inference
that the applicant has applied for asylum. The same principles govern the disclosure of
information related to credible fear and reasonable fear determinations. They also generally
apply to applications for withholding or deferral of removal under Article 3 of the
Convention Against Torture, which are included in the asylum application.

5. **Q: Under the regulation's exceptions, can asylum-related information be disclosed to
state law enforcement agencies or other state agencies?**

    A: No. The confidentiality regulation does not allow disclosure of asylum-related
    information to state agencies, including state law enforcement agencies, except with the
    asylum applicant's written consent or the Secretary of Homeland Security's specific
    authorization. The regulation at 208.6(c)(2) do, however, allow for disclosure to state or
    local courts under certain circumstances.

6. **Q: Under the regulation, how can a United States Government official or contractor,
who is seeking asylum-related information and to whom asylum-related information
may be disclosed, obtain that information from the United States Citizenship and
Immigration Services (USCIS)?**

    A: Unless there is a pre-existing interagency arrangement or protocol, government officials
    or contractors should request asylum-related information about specific aliens directly from
    the appropriate USCIS Asylum Office Director with jurisdiction over the alien's application.
    Requests for asylum-related information concerning groups of aliens that match certain
    identified criteria must be made to the Chief of the Asylum Division of USCIS by the
    appropriate official in the requesting agency.

7. **Q: If asylum-related information is properly disclosed to a third party pursuant to the
regulation, what is the third party's obligation with respect to confidentiality?**

    A: As the new custodian of the asylum-related information, the third-party recipient is
    bound by the confidentiality regulation under 8 CFR 208.6. The recipient must not disclose
    the asylum-related information to other parties, except as authorized by the regulation.

8. **Q: What are the obligations of U.S. government officials or contractors who work with
or are responsible for maintaining asylum-related information in U.S. government
systems?**

    A: U.S. government officials or contractors who encounter asylum-related information in
    their work are bound by the confidentiality regulation under 8 CFR 208.6. These personnel
    must not disclose the asylum-related information to third parties, except as authorized by the
    regulation. When making an authorized disclosure of asylum-related information to a third
    party, these personnel should alert the third party to the confidentiality requirements of 8
    CFR 208.6.

4

Prepared by the USCIS Asylum Division
Date: October 18, 2012

9.  **Q: Are non-USCIS custodians of asylum-related information required to obtain
    authorization from USCIS before disclosing the asylum-related information to another
    party pursuant to the regulation?**

    A: No. However, the transmitter of information should take reasonable steps to ensure that
    the new recipient of information is aware of the confidentiality rules described in this
    document to prevent unauthorized disclosure by the new recipient. The transmitter may want
    to provide the new recipient with a copy of this document for that purpose.

10. **Q: Is there an interagency arrangement between members of the Intelligence
    Community and agencies with counterterrorism functions and USCIS concerning the
    disclosure of asylum-related information?**

    A: On October 8, 2001, the Attorney General used his discretionary authority under 8 CFR
    208.6 to provide the FBI access to asylum applications filed with USCIS for the purpose of
    gathering foreign counterintelligence or international terrorism information unrelated to
    pending criminal or civil litigation. This arrangement was superseded in an April 18, 2007,
    memorandum whereby Secretary of Homeland Security Chertoff exercised his authority
    under 8 CFR 208.6 to allow disclosure of asylum-related information to any element of the
    U.S. Intelligence Community or any other federal or state agency having a counterterrorism
    function, provided that the need to examine the information or the request is made in
    connection with its authorized intelligence or counterterrorism function or functions and that
    the information received will be used for the authorized purpose for which it was requested.
    On August 25, 2011, Secretary Napolitano signed an addendum to the 2007 Memorandum.
    The addendum expands sharing of asylum-related information to include sharing with any
    local government agency having a counterterrorism function.

    In general, requests for disclosure of asylum-related information shall be made to the DHS
    Office of Intelligence and Analysis Support Branch (IASB) using the DHS Support Request
    Form. Requests for asylum information must include a detailed justification directly linking
    the request to an authorized intelligence or counterterrorism function, as IASB is required to
    validate requests with the offices of Privacy, Intelligence Oversight, and the General
    Counsel. The request for asylum information must be approved by an individual with
    supervisory command from the requesting office.

    If the request for disclosure, or pre-emptive disclosure if no request is made, occurs in
    accordance with the terms and conditions of any applicable standing information-sharing
    arrangements between DHS and the recipient, disclosure may be made without using the
    DHS Support Request Form.

11. **Q: Can members of the Intelligence Community and agencies with counterterrorism
    functions that receive asylum-related information further disseminate it?**

    A: Under certain limited circumstances, an element of the Intelligence Community or other
    federal, state or local governmental agency having a counterterrorism function that received
    asylum or refugee-related information may further disseminate that information, but such

5

Prepared by the USCIS Asylum Division
Date: October 18, 2012

further disclosure must be authorized by the Secretary, Deputy Secretary or the Under
Secretary for Intelligence and Analysis acting in coordination with the Director, USCIS, the
Assistant Secretary, ICE or any other DHS official to whom disclosure authority under
section 208.6(a) has been delegated.

## 12. Q: Are there any other interagency arrangements?

A: Yes. In 2002, the Attorney General authorized the Asylum Division to disclose to the
Office of Refugee Resettlement (ORR) of the Department of Health and Human Services
(HHS) biographical information on individuals granted asylum to enable ORR to meet
congressional reporting requirements and generate statistical reports used to allocate funding
for asylee social benefits. In 2001 the Attorney General authorized the Asylum Division to
disclose to HHS certain biographical information on asylees to enable ORR and the Center
for Disease Control (CDC) to provide emergency relief to qualified asylees.

## 13. Q: Can asylum-related information be shared with foreign governments or international organizations (such as INTERPOL)?

A: Asylum-related information cannot be shared with foreign governments or international
organizations without the written consent of the asylum applicant, except at the discretion of
the Secretary of Homeland Security. Secretary Napolitano has exercised her discretion to
permit regular sharing of asylum-related information with Canada, Australia, the United
Kingdom, and New Zealand. Secretary Ridge initially allowed the sharing of asylum-related
information with Canada in 2003. The arrangement with Canada is in the form of a
*Statement of Mutual Understanding on Information Sharing* (SMU) and an Asylum Annex to
the SMU, which together permit Canada's Department of Citizenship and Immigration
Canada (CIC) and USCIS to exchange asylum-related records on both a case-by-case and
systematic basis.

Since the signing of the Asylum Annex to the Statement of Mutual Understanding on
Information Sharing between the U.S. and Canada in 2003, USCIS and CIC have engaged in
a regular exchange of information on asylum claims on a case-by-case basis. More recently,
the USCIS Asylum Division has worked with US-VISIT on sharing information relating to
refugee claimants as defined in the agreement under the Five Country Conference (FCC)
High Value Data Sharing Protocol (Protocol). Beginning in 2010, the Asylum Division
commenced information sharing under the FCC Protocol with Canada, Australia, and the
United Kingdom. The Asylum Division commenced information sharing under the FCC
Protocol with New Zealand in 2011.

## 14. Q: Why are there special information-sharing agreements with Canada, Australia, the United Kingdom, and New Zealand?

A: Sharing information on asylum seekers was included as an initiative in the agreement
signed by former Attorney General Ashcroft and former Canadian Minister of Citizenship
and Immigration Caplan on December 2, 2001. It was also one of the thirty initiatives
included in the Ridge-Manley Smart Border Action Plan. In furtherance of this initiative, the

Prepared by the USCIS Asylum Division
Date: October 18, 2012

United States and Canadian governments entered into a formal arrangement in 2003 that permits USCIS and CIC to systematically share information on individuals seeking asylum in the U.S. or Canada. The subsequent information-sharing agreements with Canada, Australia, the United Kingdom, and New Zealand through the Five Country Conference (FCC) High Value Data Sharing Protocol (Protocol) further strengthen USCIS's capacity to acquire information relevant to asylum adjudications. By gaining access to this key information, USCIS and the immigration authorities in Canada, Australia, the United Kingdom, and New Zealand will enhance their abilities to prevent abuse of the asylum process in their respective countries and to make accurate asylum eligibility determinations, thereby strengthening the integrity of each country's asylum system.

**15. Q: What is the status of the implementation of the information-sharing arrangement with Canada?**

A: USCIS and CIC have been sharing information on asylum seekers on a case-by-case basis since 2003. As of 2010, the USCIS Asylum Division has also worked with US-VISIT to share asylum-related information with Canada under the Five Country Conference (FCC) High Value Data Sharing Protocol (Protocol). The 2011 Beyond the Border agreement between the United States and Canada includes an action plan for enhanced information sharing between the two countries. USCIS and CIC and their technical specialists are working together to develop a fully automated systematic sharing of information to cover all asylum claimants who are subject to biometric collection requirements by 2014.

**16. Q: May protected asylum-related information be shared with congressional offices?**

A: If the Chairman of a congressional committee with competent jurisdiction submits a written request for protected asylum-related information, the requested information will generally be provided without regard to the regulation. Written requests for asylum-related information by individual Members of Congress or their respective staff members will be considered on a case-by-case basis.

**17. Q: What information can be shared with the press when the applicant has gone public with the asylum claim?**

A: Because the regulation currently requires the applicant's written consent, we generally do not recognize implicit waivers of confidentiality, even when the asylum-related information is a matter of public record.

**18. Q: Does 8 CFR 208.6 apply to refugee information?**

A: As a matter of policy, USCIS extends the same protections outlined in 8 CFR 208.6 to refugees.

If you have any questions regarding these policies, please contact the Asylum Division's Operations Branch Chief at 202.272.1651.